the defendant by the plaintiff, on March 7, 1904, for the payment of the said. sum, together with the payment of an additional sum of $25.14, which the plaintiff claims to be due by the defendant as a 5 per cent. penalty for failure to pay within said 10 days, as so required, but which said amount defendant refused and since refuses to pay to plaintiff."

The life tenant's estate was vested—that much is conceded—and in my opinion passed to her in possession and enjoyment at the death of the testator, namely, on December 13, 1901. On that date the will took effect, the estate vested, and the obligation to pay the tax came into being. The government's right to demand a tax was then complete, and it only remained to ascertain the amount. This was properly done by valuing the estate according to the accepted tables of mortality. U. S. v. Fidelity Trust Co., 222 U. S. 158, 32 Sup. Ct. 59, 56 L. Ed. ——. Such valuation could not have been objected to, and would probably have met with no dispute, if the life tenant had been alive at the expiration of the year of grace that the act of March 2, 1901, allows for the payment of the tax. But I think the death of the life tenant before the end of her expectancy can make no difference in the method of ascertaining the actual value of the estate to be taxed. Before the death of a life tenant, no one can be sure of the exact value. The tenant may live longer than the expectancy declared by the tables. In that event, the actual value of the estate is shown to be larger than the value put upon it at the testator's death. On the other hand, the tenant may die before the limit of expectancy is reached, and thus the actual value will be shown to be less than the value at the testator's death. But it cannot be believed that the government must wait for its tax until the life tenant shall die, in order that the actual value may be ascertained beyond peradventure. The law permits a reasonable course to be taken—the use of mortality tables—so as to reach an average, and exceptional cases must necessarily be disregarded. In a situation like the present, the government gets a larger sum than could have been exacted if the date of the life tenant's death could have been predicted; but, if the tenant proves to be unusually long lived, it may easily receive less than its due. These contingencies do not alter the general statutory rule. The tax is laid upon the actual value of the estate. This is the value at the time when the estate vests. And a vested life estate passes when a testator dies, and its value is to be ascertained as of that date. Hertz v. Woodman, 218 U. S. 205, 30 Sup. Ct. 621, 54 L. Ed. 1001.

The clerk is directed to enter judgment in favor of the government for $527.86.

---

### In re KARP et al.

(District Court, S. D. New York. May 4, 1912.)

BANKRUPTCY (§ 136*)—COMPELLING SURRENDER OF PROPERTY BY BANKRUPT —IMPRISONMENT—EXTENT.

Where bankrupts were imprisoned for contempt for failure to comply with an order requiring them to turn over assets alleged to have been withheld to their trustee, such imprisonment would not be con-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tinued indefinitely, but they would be discharged after a reasonable time on its appearing that they were not able to comply with the order.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 235; Dec. Dig. § 136.*]

In the matter of bankruptcy proceedings of Samuel and Jacob Karp. Application by the bankrupts to be purged of contempt and be released from jail. Granted.

Lehmaier & Pellet, of New York City, for the motion.
Saul S. Myers, of New York City, opposed.

MAYER, District Judge. The bankrupts herein apply to be purged of contempt of court and for release from jail. They were adjudged guilty of contempt by an order entered December 5, 1911. On or about January 31, 1911, they were arrested under a writ of ne excat. Samuel Karp remained in custody and in jail until the early part of April, 1911, a period of about two months, whereupon he was released on bail. Jacob Karp remained in jail under the writ of ne excat until July, 1911, a period of about six months, and then was released on bail. Various applications in connection with various proceedings herein have been made to the judges of the court, but only one prior application has been made in respect of the order adjudging these bankrupts guilty of contempt. This application was made before Judge Hand in the latter part of February, 1912, less than three months after the contempt order had been entered.

There are submitted on behalf of the bankrupts various affidavits which were not before Judge Hand, and which account for various sums of money claimed to have been used for the support of the families of the bankrupts and for counsel fees. The affiants state their businesses and addresses, and set forth with particularity the dates and amounts of the moneys advanced as above stated for the benefit of the bankrupts. The condition of the families of these bankrupts, consisting, in each instance, of a wife and a large number of minor children, is pitiable, and in that regard affidavits are made by the superintendent of a charitable society and the president of a benevolent association. Nothing has been presented to contradict the affidavits as to the condition of these two families, and I presume that, if the conditions were other than set forth, counsel for the trustee would have called the same to my attention in view of the fact that these two men connected with benevolent organizations had given their addresses and could have been readily interviewed. But, in addition to what appears on the face of the papers, I have had an independent investigation made by a responsible official of a responsible philanthropic organization, and he has reported to me that the conditions of these two families are as represented. A copy of his report to me is hereto annexed. The report of the special master, rendered after a thorough and painstaking inquiry, shows that these two bankrupts were guilty of gross misconduct, and have defrauded the creditors out of assets to the amount of about $14,600. The special master has found that Samuel Karp was initially responsible for the disappearance of $10,200

and Jacob Karp for $4,470 and, believing that they were acting in co-operation, he recommended that an order be made directing both of the bankrupts to turn over the total sum of $14,500 in round numbers. The situation, as thus briefly outlined, is difficult of solution.

The object of these proceedings is to compel the bankrupts to turn over the amount referred to and to uphold the dignity of the court and command obedience to law. If corrupt bankrupts believed that there is any definite period within which they may be released from custody, it may well be that some of them would willingly submit to an order for contempt as a slight penalty for the making away of assets to the detriment of merchants who have extended credit to them. On the other hand, where it appears that bankrupts are not able to respond, there must be some limit to imprisonment, for it certainly was never intended that imprisonment should be perpetual. It is never easy to discover what has become of secreted assets, but it not infrequently happens that such assets are dissipated in the efforts of the corrupt bankrupt to save himself from the penalty of the law, and to support his family obligations during a period when he is unable to get into a new business or employment. In this case the trustee and his counsel have rendered a distinct service by their commendable pursuit of these bankrupts and the bankrupts must realize, to the fullest extent, the serious character of their acts. Samuel Karp has been confined altogether (on the writ of ne exeat and the contempt order) for a period less than his brother, and is entitled to less consideration because of the gravely discreditable story which he told as to the disappearance of the money in his possession.

Under all the circumstances, an order will be made discharging the bankrupts from custody as follows: Jacob Karp on May 7, 1912, and Samuel Karp on June 1, 1912. Settle order on two days' notice.

---

## GALLAGHER v. FLORIDA EAST COAST RY. CO.

(District Court, S. D. New York. May 14, 1912.)

1. COURTS (§ 359*)—FEDERAL COURTS—RULES OF DECISION—POLICY OF STATE.
    The federal courts consider the policy of the state in which they are situated in determining the enforceability of statutes of other states.

    [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 939–949; Dec. Dig. § 359.*
    State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

2. DEATH (§ 35*)—STATUTES—FOREIGN STATUTES—ENFORCEMENT—PUBLIC POLICY.
    A Florida statute creating a cause of action for wrongful death provides that, where the decedent leaves no widow, minor child, or person dependent on him for support, an action may be maintained by his executor or administrator, and the recovery is an asset of the decedent to be distributed as if it were an actual asset belonging to the decedent at the time of his death. *Held*, that such act construed by the Florida courts to authorize a distribution of the amount recovered to creditors

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes